## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GEORGE W. SCHOY, JR., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 06-537-GMS/MPT |
| | : | |
| MICHAEL J. ASTRUE, Commissioner | : | |
| of Social Security, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## <u>REPORT and RECOMMENDATION</u>

George W. Schoy, Jr., Pro Se, Wilmington, Delaware

Colm F. Connolly, United States Attorney and Joyce M. J. Gordon, Special Assistant United States Attorney, Patricia A. Stewart, Special Assistant United States Attorney, United States Attorney's Office, Wilmington, Delaware.

    <u>Of Counsel</u>: Michael McGaughran, Regional Chief Counsel Social Security Administration and Nicole Schmid, Assistant Regional Counsel Social Security Administration, Philadelphia, Pennsylvania.
Counsel for Defendant

June 17, 2008
Wilmington, Delaware

**Thynge, U.S. Magistrate Judge**

## I. INTRODUCTION

Plaintiff George W. Schoy, Jr. ("plaintiff") filed this action against defendant Michael J. Astrue[1], Commissioner of Social Security ("defendant"), on August 31, 2006. D.I. 2.  Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405 (g), of a decision by defendant denying his claim for disability income benefits under § 216 (I) of the Social Security Act.  D.I. 18 at 1.  Currently before the court are the parties' cross motions for summary judgment.  D.I. 17, 18.  For the reasons stated below, the court recommends denying plaintiff's motion for summary judgment and granting defendant's cross-motion for summary judgment.

## II. BACKGROUND

### A. Procedural Background

On April 2, 2004, plaintiff filed an application for disability insurance benefits claiming disability since March 23, 2001.[2]  Plaintiff alleged that he was disabled as a result of cervical spondylitis, radiculopathy, emphysema, and high blood pressure that resulted in a limited ability to lift or carry objects, difficulty walking and sitting, and memory problems.[3]  The claim was initially approved by the Delaware Bureau of

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, after this proceeding was initially filed.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue, replaced the previous Commissioner of Social Security, Jo Anne B. Barnhart, as defendant in this case.

[2] D.I. 13 at 48.

[3] *Id.* at 88-89.

2

Disability Determination (state agency) with an onset date of January 1, 2004.[4]  Plaintiff

requested reconsideration of the state agency's determination alleging that the correct

onset date of the disability was April 2, 2003, not January 1, 2004.  The state agency

denied plaintiff's request for reconsideration.  Plaintiff, subsequently, requested a

hearing before an administrative law judge ("ALJ").  The hearing was held on December

1, 2005.  On February 7, 2006, the ALJ denied the plaintiff's claim.  The ALJ found the

following:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in section 216(i) of the Social Security Act through March 31, 2006.
2. The claimant has not engaged in substantial gainful activity since March 23, 2001 (20 CFR § 404.1520(b)).
3. The claimant has the following severe impairments: chronic ischemic heart disease and back disorder (20 CFR § 1404.1520(c)).
4. During the contested period, the claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Regulations No. 4 (20 CFR § 404.1520 (d)).
5. Upon careful consideration of the entire record, the undersigned finds that, during the contested period, the claimant had the residual functional capacity to perform sedentary[5] exertional work, lifting and carrying up to ten pounds, sitting 6 hours, standing and walking 2 hours in an eight-hour day, with limited non-continuous pushing and pulling, occasional postural activities, occasional reaching overhead, and limited exposure to environmental pollutants.

--------

[4] *Id.* at 35 (state agency found that plaintiff was disabled due to chronic ischemic heart disease and that his condition met listing 4.04 of the Commissioner's listed impairments).

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 CFR § 404.1567(a).

6. The claimant was unable to perform past relevant work during the contested period (20 CFR § 404.1565).

7. The claimant was born on January 26, 1952, and was 51 years old on the alleged disability onset date, which is defined as closely approaching advanced age (20 CFR § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9. Transferability of job skills is not material to the determination of disability due to the claimant's age and the limitation to jobs with simple tasks and instructions (20 CFR § 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant number in the national economy that the claimant could perform during the contested period (20 CFR §§ 404.1560(c) and 404.1566).

11. The claimant was not under a "disability" as defined in the Social Security Act prior to January 1, 2004 (20 CFR § 404.1520(g)).

On July 7, 2006, the Appeals Council denied review of the ALJ's determination, so those findings became the final decision of the Commissioner.

**B. Plaintiff's Written Submissions to SSA**

On April 2, 2004, plaintiff submitted an Application for Disability Insurance Benefits claiming that his disabling condition prevented him from working since March 23, 2001.[6] In a supplemental undated Adult Disability Report, plaintiff claims that cervical spondylitis, radiculopathy and emphysema limits his ability to work because those conditions prevent him from lifting and carrying objects, inhibit his ability to walk and sit, and cause memory problems.

Plaintiff submitted an undated Personal Pain Questionnaire, indicating constant pain specific to the neck, back (upper and lower), both arms, hands and fingers. At its

---

[6] All facts and medical information reference herein are found at D.I. 13 (Although plaintiff stopped working on March 23, 2001, plaintiff is only seeking benefits retroactively from April 2, 2003 through December 31, 2003).

4

worst, plaintiff describes the pain as excruciating.  At its least, plaintiff describes the pain as discomforting.  Plaintiff claims that the pain interferes with his appetite, sleep, as well as, his work, family and social life.

On June 21, 2004, plaintiff also submitted a Daily Activities Questionnaire.  In the questionnaire, plaintiff indicated that his daily routine consists of waking up, taking medications (twice daily), eating breakfast, lunch and dinner, watching several hours of television, a couple hours of recreation time on the computer and ice or heat treatments for pain relief.  Plaintiff noted that when the pain becomes "chronic", he rests and relaxes more frequently, claiming that he is not able to do "anything" during such periods.

Plaintiff further indicated that he is able to cook meals for himself on a regular basis and completes household chores, such as cleaning, vacuuming, dusting, etc., one to two times per week.  Plaintiff noted as well, that he does not require any outside help to take care of himself, but at times will ask his roommate for help to complete household chores.  Plaintiff further claimed that he obtained groceries either by walking to the local convenient store, or by taking a bus to the supermarket.

Plaintiff further stated that before his condition worsened, he was extroverted and since the worsening of his condition, he has become introverted.  Plaintiff maintained because of his condition, he no longer participates in social events.  Plaintiff pointed out that his only form of communication with friends and family is through the internet.

Plaintiff reported that his condition prevents him from working.  Plaintiff asserted that the pain and discomfort causes extensive tardiness and absenteeism from work,

thus, making him essentially unemployable.

### C. Facts Evinced at the Administrative Law Hearing

#### 1. Plaintiff's Testimony

At the ALJ hearing, plaintiff testified that between 1990 and 2001, he worked as a driver for a drug and alcohol counseling service, a resident assistant at a homeless shelter, and most recently as a data entry operator at a furniture store.  Plaintiff further testified that he was laid off from the data entry position in March of 2001 as a result of the great number of sick days that he took, and because his employer introduced a new accounting system, which replaced him.  Plaintiff indicated that he had not been employed since being laid off from the furniture store in 2001.

Plaintiff testified that he was unable to work between April 2, 2003 and December 31, 2003 because of constant pain in his cervical area.  Plaintiff indicated that he had a cervical laminectomy on the C6, C7 vertebrae in 1985 and a cervical foraminotomy that was done from the C3 to the C7 vertebrae in 1986.  Plaintiff noted that since the last surgery in 1986, he constantly suffers from medical and muscular atrophy in his left arm.  Plaintiff further stated that during the contested period, he was unable to lift anything with his left arm.  Plaintiff maintained that he could not type due to a lack of feeling in his left thumb and forefinger. The testimony showed, however, that plaintiff was able to use his left thumb and forefinger for data entry while employed at the furniture store.

Plaintiff testified that between April 2, 2003 and December 31, 2003, his cervical problem was the only condition inhibiting his ability to work.  Plaintiff claimed that during

this period, the cervical pain was constant.  When asked to rate the pain on a scale of 1-10, 10 being the worst pain, Plaintiff testified that the pain is a 10, sometimes as severe as a 15.  Plaintiff stated that sitting upright in a chair with either hot or cold treatments would alleviate some of the pain in his cervical region.

Plaintiff added that walking aggravated his condition and that he could only walk for half of a block, or five minutes during the contested period in 2003.  Plaintiff also stated that he could only stand for an hour and a half at most.

Plaintiff testified that he also suffered from back spasms.  When asked if the spasms affected his ability to perform his data entry job in 2001, plaintiff answered that the spasms caused headaches, a lack of coordination and trouble concentrating.

Plaintiff further testified that from April 2, 2003 until July 2003, he was not taking any narcotic pain medication because he understood that the shelter where he resided did not permit residents to take such medication.  In July 2003, plaintiff learned that narcotic pain medication was allowed while living at the shelter with a prescription from a doctor.  Plaintiff, subsequently, began taking Percocet, as prescribed by a physician, on a regular basis at that time.  Plaintiff added that the Percocet caused lightheadedness, dizziness, nausea, diarrhea and constipation.

Due to his physical condition, Plaintiff testified that during the contested period in 2003, he had trouble sleeping.  Plaintiff added that during that period, his existence consisted entirely of watching TV, "playing" on the computer and sleeping.  Plaintiff pointed out that he could spend up to an hour on the computer at a time.

During the hearing, plaintiff physically demonstrated to the ALJ that his neck movements were limited.  Plaintiff advised the ALJ that he was barely able to move his

neck forward or backward.  Furthermore, plaintiff testified that side to side motion of his neck was limited as well; he could not turn his neck at an angle greater than forty-five degrees.

Plaintiff posited that he could not have participated in any form of classroom training during the contested period.  Plaintiff also maintained that, during that time, he could not hold a desk job because of his lack of concentration, dizziness, lightheadedness, and therefore, he could not complete certain tasks or functions related to such a job.

### 2. Vocational Evidence

During the administrative hearing, the ALJ called a vocational expert, Bruce Martin ("Martin"), to testify.  In discussing plaintiff's past relevant work, Martin testified that the data entry work was classified as sedentary and is semi-skilled.  The work as a resident assistant, which is the same as a front desk clerk, is classified as light work and is also semi-skilled.  Martin added that plaintiff's past work as a driver is classified as medium work and is semi-skilled.  The ALJ then asked Martin the following hypothetical question:

> If you consider an individual whose age is near to the claimants age of 51[7] with a high school education and the work history you just described, further assume this individual could lift-carry twenty pounds occasionally, ten pounds frequently, stand or walk six hours out of an eight-hour day, sit six hours out of an eight-hour day, was limited to non-continuous pushing and pulling.  Further, this individual could occasionally climb ramps, stairs, ladders, ropes, scaffolds, balance, stoop, kneel, crouch and crawl, occasionally reach overhead, and would have to avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, and fumes.  Could . . . this hypothetical individual perform any of the claimant's past relevant work?

---

[7] The claimant was 51 years old in April 2003.

8

Martin answered in the affirmative, opining that the hypothetical individual could perform plaintiff's past work as a data entry clerk or a front desk clerk. The ALJ then asked the following question:

> If we change this hypothetical to be, basically sedentary work, ten pounds, occasionally, less than ten frequently, stand or walk two hours out of an eight-hour day, sit six hours out of an eight-hour day, even with the same limitations as on the push-pull and the other elements I described earlier, could this individual do any of the claimant's past relevant work?

Martin again answered in the affirmative, asserting that such a hypothetical individual could perform plaintiff's past work as a data entry clerk. The ALJ then asked the follow hypothetical question:

> If the same hypothetical individual were, because of pain and inability to concentrate, were limited to simple, jobs with simple tasks and instructions, could that hypothetical individual continue to do . . . the data entry work?

Martin testified that such hypothetical individual could not work as a data entry clerk. Martin opined that such a hypothetical individual could perform unskilled work, specifically such work that does not require keyboarding or "lengthy concentrated periods of concentration." Martin stated that such unskilled work includes the following job titles;  information clerk, records clerk and billing clerk, concluding that there are about 55,000 information clerk jobs nationally with 95 located in Delaware. He also determined that there are 37,000 record clerk jobs nationally with 90 available regionally; and, there are 24,000 billing clerk jobs nationally with 55 positions regionally. The ALJ then asked the following question:

> Assume I find that the claimant's testimony is totally credible and that his impairments, the impairments in his condition as he described it are supported

9

by the medical evidence, would there be any jobs that that person could do? Martin concluded that no jobs exist in the economy that such a person could perform with the alleged limitations.

### 3. Medical Evidence

On April 2, 2003, Dr. John J. Moore, D.O. completed a medical certification for the State of Delaware Division of Social Services.  In this certification, Dr. Moore acknowledged plaintiff's diagnosis with cervical joint disease.  Dr. Moore opined that plaintiff was not able to work at his usual occupation or participate in classroom training.  Dr. Moore further opined that the above limitations would last for approximately six to twelve months, and plaintiff should not perform any other work on a full time basis.

Throughout April and May 2003, Dr. Moore treated plaintiff for complaints of pain.  On April 20, 2003, Dr. Moore treated plaintiff for complaints of neck pain and noted that plaintiff had mildly reduced muscle strength in his arms.  On April 25, 2003, Dr. Moore treated plaintiff for complaints of buttock pain.  Dr. Moore felt that the pain may have been caused by plaintiff's mattress.

On May 12, 2003, plaintiff underwent an x-ray study and a magnetic resonance imaging (MRI) study of his cervical spine.  The study revealed fusion of the C6 and C7 vertebrae with forward kyphosis.  The disc level of C2-C3 showed left lateral disc protrusion encroaching on the right neural foramen.  The disc level at C3-C4 evidenced broad-based disc bulging impressing on the ventral aspect of the cervical cord and no cord compression was seen.  The disc level at C4-C5 depicted a left lateral spur formation encroaching on the left neural foramen.  The disc level at C5-C6 showed spur

formation encroaching on the right neural foramen.  The disc level at T1-T2 revealed a central disc herniation impressing on the ventral aspect of the thoracic cord.

On May 13, 2003, Dr. Moore interpreted those results.  Dr. Moore opined that the results were caused by arthritic changes.  He further stated that there was no evidence of a "slipped" disc.  On May 28, 2003, plaintiff told Dr. Moore that his pain was better.  Subsequently, Dr. Moore diagnosed plaintiff with degenerative joint disease.

On July 25, 2003, plaintiff visited the New Castle Family Care facility for neck pain.  Dr. Phyllis James, M.D. diagnosed plaintiff with chronic neck pain.  On August 22, 2003, Dr. James concluded that plaintiff had a herniated disc in his thoracic spine and referred plaintiff to a neurosurgeon.  Plaintiff was also diagnosed at the New Castle Family Care facility with high blood pressure.

Dr. James prescribed seven medications to plaintiff that he was still taking as of August 2004.  The seven medications include: Aspirin for preventive heart care; Choline for pain; Diovan for blood pressure; Endocet for pain; Flexeril for pain and muscle relaxation; Naproxen as an anti-inflammatory; and Neurontin for pain.

On April 22, 2004, plaintiff underwent a cardiac exercise stress test at the Tri-State Cardiovascular Institute.  The results of the test indicated that plaintiff had abnormal myocardial perfusion.  Dr. Kamar T. Adeleke, M.D. concluded that plaintiff had moderate ischemic ventricular dysfunction and uncontrolled hypertension.  Dr. Adeleke, also noted that the epidural injections plaintiff received, to cope with his neck pain, no longer helped.  Dr. Adeleke further diagnosed that plaintiff had degenerative joint disease and severe cervical radiculopathy.  Dr. Adeleke recommended that plaintiff stop smoking and undergo a cardiac catheterization.

11

In November 2004, a state agency disability adjudicator concluded that plaintiff's April 2004 stress test showed listing level coronary artery disease.  The adjudicator found plaintiff met listing 4.04A5 of the Commissioner's listed impairments and that his onset date was as of January 1, 2004, three months prior to the date of the stress test. The adjudicator also noted plaintiff's alleged disability due to cervical problems.  The adjudicator concluded that the evidence shows a history of cervical disc disease, which was not severe enough to restrict him to less than sedentary activities.

### III. Standard of Review

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."[8]  42 U.S.C. § 405 (g) (2002); 5 U.S.C. § 706 (E) (1999); *see Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3rd Cir. 1986).  As the Supreme Court has held,

> substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion...[it] must do more than create a suspicion of the existence of the fact

---

[8]Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.  Such action shall be brought in the district court of the United States for the judicial district which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the District Court of the United States for the District of Columbia (United States District Court for the District of Columbia)."  42 U.S.C. § 405 (g) (2002).

> to be established...it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951); *citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *citing NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

The Supreme Court has embraced a similar standard for determining summary judgment pursuant to Fed. R. Civ. P. 56:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

> Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under Federal Rules of Civil Procedure 50 (a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.  If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

"Overall this test is deferential, and we grant similar deference to agency inferences from facts if those inferences are supported by substantial evidence, even where this court acting de novo might have reached a different result."  *Monsour Med. Ctr.*, 806 F.2d at 1190.  Furthermore, "the evidence must be sufficient to support the conclusion of a reasonable person after considering the evidentiary record as whole, not just the evidence that is consistent with the agencies finding."  *Id.*  Therefore, " a single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence."  *Morales v. Apfel*, 225

F.3d 310 (3rd Cir. 2000). "Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., that offered by treating physicians)- or if it really constitutes not evidence but mere conclusion." *Id.*

Where, the countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reason for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3rd Cir. 1990).

### IV. Discussion

#### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423 (a) (1) (D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § (d) (1) (A) (2002).

The Third Circuit outlined the appropriate test for determining whether a disability exists in *Plummer v. Apfel*:

> In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period. A claimant is considered unable to engage in any substantial activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a claimant is under a disability.  In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  If the claimant is found to be engaged in substantial gainful activity, the disability claim will be denied.  In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  If the claimant fails to show that her impairments are 'severe', she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  The claimant bears the burden of demonstrating an inability to return to her past relevant work.

If the claimant is unable to resume her former occupation, the evaluation moves to the final step.  At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.  The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with her medical impairments, age, education, past work experience, and residual functional capacity.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.  The ALJ will often seek the assistance of a vocational expert at this fifth step.

186 F.3d 422, 427-28 (*internal citations omitted*).  If the ALJ determines that a claimant is either disabled or not disabled at any step in the sequence, the analysis does not proceed to the next step.  *See* 20 C.F.R. § 404.1520 (a) (2002)*.*

**B. Application of the Five-Step Test**

In the present case, steps one, two and four of the five-part test to determine whether a person is disabled are not at issue:  (1) The ALJ determined that plaintiff has not engaged in substantial gainful activity since the alleged onset of his disability on April 2, 2003; (2) the ALJ determined that plaintiff's back disorder was "severe" during the

contested period from April 2, 2003 to December 31, 2003; (4) the ALJ concluded that plaintiff was unable to perform past relevant work during the contested period.

Plaintiff, on appeal, avers that the ALJ erred in determining the third and fifth steps of the five-part test:  (3) the ALJ determined that during the contested period, plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR. 404, Subpart P, Appendix 1, Regulations No. 4 (20 CFR § 404.1520 (d)); (5) the ALJ found that during the contested period, considering plaintiff's age, education, work experience, and residual functional capacity, there were jobs that exist in significant number in the national economy that the claimant could perform.

### C. Plaintiff's Contentions

Plaintiff challenges the decision of the ALJ on various grounds.  Plaintiff first contends that the ALJ falsely concluded plaintiff's subjective complaints of pain were not credible.  Plaintiff asserts that his subjective complaints of pain were supported objective medial evidence.  Next, plaintiff contends that the ALJ did not provide a sufficient factual basis to support the conclusion that plaintiff was not disabled.  Plaintiff, further, alleges that the ALJ failed to provide substantial evidence to support his determination that there are other jobs that exist in the national economy that claimant could perform.  Plaintiff argues that the assertions of the vocational expert, regarding potential jobs for plaintiff, were not supported by substantial evidence.

### D. Plaintiff's Subjective Complaints of Pain

"Allegations of pain and other subjective symptoms must be supported by

objective medical evidence." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3rd Cir. 1999).  The

Third Circuit continued that once an ALJ concludes a medical impairment exists, that

could reasonably be attributed to the alleged pain, the ALJ "must evaluate the intensity

and persistence of the pain or symptom, and the extent to which it affects the indivdual's

ability to work.  This obviously requires the ALJ to determine the extent to which a

claimant is accurately stating the degree of pain or the extent to which he or she is

disabled by it." *Id.*

Furthermore, the social security statute requires deference to the ALJ's findings of

fact, so long as those findings are supported by substantial evidence of record.  *Monsour*

*Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3rd Cir. 1986).  Although "an ALJ must give

serious consideration to claimant's subjective complaints of pain," *Mason v. Shalala*, 994

F.2d 1058, 1067 (3rd Cir. 1993), subjective complaints of pain " do not in themselves

constitute disability."  *Green v. Schweiker*, 749 F.2d 1066, 1070 (3rd Cir. 1984).

Subjective complaints of pain are given "great weight" unless there is conflicting medical

evidence.  *See Mason*, 994 F.2d at 1067-68.  When a claimant's subjective complaints of

pain indicate a greater severity of impairment than the objective medical evidence

supports, the ALJ can give weight to factors such a physician's reports and claimant's

daily activities.  *See* 20 C.F.R. § 404.1529 (c) (3) (1995).

"A cardinal principle guiding disability eligibility determination is that the ALJ

accord treating physicians' reports great weight."  *Morales v. Apfel*, 225 F.3d 310, 317

(3rd. Cir. 2000).  "Where a treating source's opinion on the nature and severity of a

claimant's impairment is 'well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record,' it will be given 'controlling weight.'" *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3rd Cir. 2001).

The ALJ determined that the record failed to provide objective medical evidence to support plaintiff's claims that his impairments, during the contested period, resulted in the severe limitations as alleged by plaintiff.  Plaintiff's first contention is that the ALJ erred in concluding that his subjective complaints of pain were not credible.  Defendant argues that the subjective complaints of pain claimed by the plaintiff were not supported by the relevant medical evidence.  This court, in evaluating plaintiff's subjective complaints of pain, will, following Third Circuit precedence, afford great weight the opinions of the treating physicians as it relates to this evidence.

In support of the determination, the ALJ emphasized that the record failed to show that the claimant required any hospitalizations, significant active treatments or significant increases or changes in prescribed medications.  In further support of his finding, the ALJ noted that the record indicates only limited and conservative treatment of the impairment.

The court agrees with the conclusion of the ALJ that plaintiff's subjective complaints of pain were not as severe as plaintiff alleged.  As summarized above, the medical record is void of any medical evidence that would contradict the findings of the ALJ.  Given the weight that this circuit gives to the medical conclusions of treating physicians, the fact that none of the several physicians from whom plaintiff sought treatment ordered any kind of aggressive treatment to combat the alleged pain, this court finds no reason to overturn the decision of the ALJ.

18

In contradiction to the findings of the ALJ, on April 2, 2003, Dr. Moore did, in fact, opine that plaintiff was not able to work at his usual occupation or participate in classroom training for approximately six to twelve months.  Furthermore, after analyzing plaintiff's x-ray and MRI study, Dr. Moore concluded that plaintiff suffered from degenerative joint disease.  However, neither Dr. Moore, nor any other subsequent treating physician, ordered any kind of aggressive treatment for the condition.  Furthermore, less than two months after the diagnosis from Dr. Moore, plaintiff told Dr. Moore that his pain was "better."

The Third Circuit permits an ALJ to disregard the opinions of a treating physician, as long as the ALJ "give(s) some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Fargnoli*, 247 F.3d at 43.  In the present case, the ALJ, in rejecting the opinion of Dr. Moore that plaintiff was unable to work at his job or attend classroom training for six to twelve months, did indicate why he chose to disagree with that specific determination.  The ALJ supported this decision by referencing the extensive medical evidence, and opinions of other physicians that contradict the conclusion of Dr. Moore.[9]

### D. ALJ's Finding that Plaintiff Was Not Disabled

Plaintiff further contends that the ALJ failed to provide sufficient evidence to support the decision that plaintiff was not disabled during the contested period from April 2, 2003 through December 31, 2003.  Plaintiff alleges that the ALJ fails to state which

---

[9] The ALJ emphasized the lack of aggressive treatments ordered by any treating physicians to support this finding.

treatments of treating physicians are inconsistent with the nature of the alleged impairments.

The court disagrees with plaintiff.  In his decision, the ALJ not only discussed the types of treatments that were administered to plaintiff, but also addressed the types of treatments that would be considered more aggressive.  The ALJ notes that plaintiff received medication for his condition, but that no increases in the amount of prescribed medication was evident.  Furthermore, the ALJ indicated what would be considered more aggressive treatment, which would evidence a more severe condition.  Such aggressive treatments included hospitalization, significant active treatment, significant office care other than for limited medical routine maintenance, and increases in prescribed medications.  The ALJ did, in fact, utilize the record to support his determination that the treatments of the physicians were inconsistent with the nature of the alleged impairments.

Plaintiff further asserts that the ALJ erred by finding plaintiff's daily activities undermined his subjective complaints of total disability without reciting plaintiff's testimony of his daily activities.  Plaintiff argues that the ALJ did not recite this testimony and show how it is inconsistent with the alleged impairments.

The court disagrees with that contention by plaintiff.  The ALJ, in his decision, considered the testimony of plaintiff regarding his daily activities.  The ALJ weighed the testimony about plaintiff's daily activities when determining if a disability existed.  In doing so, the ALJ discussed plaintiff's ability to walk, stand and use a computer.  The ALJ, subsequently, concluded that the medical evidence, disputing the existence of a disability, vastly overshadowed the daily activity testimony by plaintiff.

Plaintiff next argues that the ALJ found that "the claimant's ability to perform all or substantially all of the requirements of [sedentary] work has been impeded by additional limitations" but does not include the additional limitations in his decision.  The court finds that the ALJ does incorporate the additional limitations into finding number five.  In explaining plaintiff's residual functional capacity, the ALJ specifically addresses the limitations of plaintiff during the contested period.

Plaintiff, further, argues that the ALJ erred by failing to include an explanation of the requirements of the jobs that the vocational expert found plaintiff could perform based upon plaintiff's residual functional capacity.  This court is unpersuaded by this argument because the ALJ incorporated plaintiff's exertional and non-exertional limitations into the hypothetical questions that were asked to the vocational expert.  Thus, the vocational expert's testimony that plaintiff could work as a data entry clerk or in the alternative as an information clerk, records clerk, or billing clerk, incorporated plaintiff's functional capacity. Therefore, this court finds it unnecessary for the ALJ to explain the requirements of each job as the requirements of the suggested jobs do not exceed plaintiff's residual functional capacity during the contested period.

### E. Vocational Expert Testimony

Plaintiff asserts that the ALJ, in discussing the vocational expert's testimony failed to explain the "additional limitations" that were set forth in the third hypothetical question to the vocational expert.  The court finds that this contention lacks merit.  The record shows that when the ALJ asked the vocational expert the hypothetical question at issue, he clearly specified additional limitations.  The ALJ stated that the job must require

"simple tasks and instructions."  Given the clear reference made by the ALJ to the testimony of the vocational expert, specifically to the third hypothetical question, the court finds no error on part of the ALJ.[10]

Lastly, plaintiff contends that if a limitation to work requiring simple tasks and instructions would prevent a person from performing plaintiff's past work as a data entry clerk, it will also prevent a person from performing the jobs as an information clerk, records clerk and billing clerk.  This assertion is unfounded, and in direct contradiction to the testimony of the vocational expert.[11]  The vocational expert testified that data entry job was semi-skilled and the other three jobs were unskilled, thus, demonstrating that a person's inability to perform the data entry job does not necessarily indicate an inability to perform the other three jobs.  Furthermore, the ALJ never adopted that additional limitation, simple tasks and instructions, into plaintiff's residual functional capacity determination.[12]

## V. Conclusion

For the reasons stated herein, it is recommended that plaintiff's motion for summary judgment be denied and defendant's cross-motion for summary judgment be granted.  An order consistent with this Report and Recommendation shall follow.

---

[10] ALJ provided a table of the three jobs that the vocational expert stated in response to the third hypothetical when discussing the "additional limitations."

[11] Plaintiff does not challenge the credibility of the vocational expert.

[12] The residual functional capacity determination was supported by substantial medical evidence as illustrated above.